# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ERNEST CORNELIUS WILLIAMS and )
DORRIS ELLIS WILLIAMS, )
                                )
      Plaintiffs, )
                                )
V. )              Case No. 4:09CV211NCC
                                )
JUDITH SILVEY, et al., )
                                )
                                )
      Defendants. )

## MEMORANDUM AND ORDER

Before the court is the Motion for Summary Judgment filed by Defendants Correctional Officer Judith Silvey (CO Silvey), Sergeant Sarah Whitener (Sergeant Whitener), Potosi Correctional Center Warden Donald "Don" Roper (Warden Roper), and Deputy Warden Cindy Griffith (Deputy Warden Griffith). (Doc. 152). The matter is fully briefed and ready for disposition. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). (Doc. 137).

## STANDARD FOR SUMMARY JUDGMENT

The court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party.  Id.  See also Fenny v. Dakota, Minn. & E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  Anderson, 477 U.S. at 247.  The nonmoving party may not rest upon mere allegations or denials of his pleading.  Anderson, 477 U.S. at 256.  "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment.  Id. at 248.

Where the non-moving party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ."  Fed. R. Civ. P. 56(e).

In ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987).  The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249.  However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."  Id. at 252.  With these principles in mind, the court turns to an analysis of Defendants' Motion.

# BACKGROUND and UNDISPUTED FACTS[1]

At all relevant times, Plaintiff Ernest C. Williams (Mr. Williams) was an inmate in the custody of Missouri Department of Corrections (the DOC); Plaintiff Dorris Ellis Williams (Mrs. Williams) was the wife of Mr. Williams; and CO Silvey, Sergeant Whitener, Warden Roper, and Deputy Warden Griffith (jointly, Defendants) were employed by the DOC at the Potosi Correctional Center (PCC).

In their First Amended Complaint, brought pursuant to 42 U.S.C. § 1983, Mr. and Mrs. Williams (jointly, Plaintiffs) allege that Defendants retaliated against them for exercising their First Amendment right to petition the government. In support of their claims, Plaintiffs state:

(a) Prior to January 19, 2008 and after, defendant Silvey routinely harassed, belittled, used racial epithets and generally made the Plaintiffs' visits with each other in the PCC visiting room uncomfortable and stressful.

(b) During Plaintiffs' visits, CO Silvey threatened plaintiffs with the termination of their visiting privileges and disciplinary action because Plaintiffs filed grievances and made complaints to the PCC administration regarding the visiting room.

(c) On January 19, 2008, after Plaintiffs had completed their visit in the PCC visiting room, defendants CO Silvey and Sergeant Whitener issued a false conduct violation against Mr. Williams and Mrs. Williams alleging that they had violated a number of institutional rules during their visit.

(d) CO Silvey and Sergeant Whitener issued the false conduct violation in retaliation for Plaintiffs' filing grievances and complaints regarding the PCC visiting room.

(e) On May 18, 2008, during Mrs. Williams' visit at PCC, Mr. Williams asked CO Silvey whether he could use the vending machines or microwave because Mrs. Williams had severe knee or leg pain. CO Silvey rejected Mr. Williams' request.

(f) The fact that Mrs. Williams had knee replacement surgery was a medically documented fact as she was not allowed to visit Mr. Williams until it was verified because of the steel in her left knee.

---

[1] The facts are undisputed unless otherwise stated.

(g)  PCC policy allows for inmates to use the vending machine and microwave in the visiting room if their visitor has a medically documented disability.

(h)  CO Silvey's insistence that Mrs. Williams use the vending machines, etc. was in retaliation for Plaintiffs filing grievances and complaints regarding the visiting room.

(i)  On May 18, 2008, while Plaintiffs were playing a card game in the visiting room, CO Silvey further retaliated against them for filing grievances and complaints by threatening to issue Mr. Williams a conduct violation for insulting behavior. Subsequently, CO Silvey forced Mr. Williams to sign the "warning logbook."

(j)  On May 22, 2008, Mr. Williams sent Warden Roper a letter notifying him of CO Silvey's unconstitutional actions.  Although Warden Roper was informed that there was an ongoing violation of Plaintiffs' constitutional rights he took no action and allowed these violations to continue. Warden Roper subsequently forwarded the letter to Deputy Warden Griffith.  Warden Roper was deliberately indifferent to the ongoing retaliation that Plaintiffs were suffering.

(k)  Deputy Warden Griffith, even though on notice of CO Silvey's violation of Plaintiffs' constitutional rights, also took no action despite the claim that CO Silvey was under her authority and control.  Similarly, Deputy Warden Griffith was deliberately indifferent to the ongoing retaliation that Plaintiffs were suffering.

(Doc. 100 at 3-5).

As clarified by the parties' pleadings relevant to the pending Motion, Plaintiffs assert CO Silvey harassed them by "belittling" them, "using racial epithets," and "making their visits uncomfortable," as evidenced by the following specific conduct:

a.      Issuing Mr. Williams a conduct warning for sharing a coffee bag;

b.      Requiring Mr. Williams to sign a warning log for playing a card game;

c.      Prohibiting Mr. Williams from using the PCC's visiting room's vending machine or microwave;

d.      Prohibiting Plaintiffs from sitting where they chose in the PCC's visiting room;

e.      Instructing officers in administrative segregation to retaliate against Mr. Williams, including issuing false conduct violations against him;

f.       Restricting the type of earrings worn by Mrs. Williams;

g.       Restricting the barrettes worn by Mr. and Mrs. Williams' grandchildren;

h.       Restricting the wigs worn by Mrs. Williams;

i.       Threatening Mr. and Mrs. Williams' visiting privileges; and

j.       CO Silvey's belittling Plaintiffs, using racial epithets, and making their visits uncomfortable.

(Doc. 153.1 Defendant's Statement of Untroverted Material Facts, hereafter (D.S.U.M.F.) ¶ 8; Doc. 163 Plaintiffs' Response to Defendants' Statement of Uncontroverted Material Facts, hereafter ("Pls. Ans.") ¶ 8).

Defendants deny that they engaged in the above conduct and that by doing so they deprived Plaintiffs of their constitutional rights; and Defendants deny that Plaintiffs suffered emotional distress, mental anguish, and humiliation as a result of Defendants' conduct. Plaintiffs sue Defendants in their individual and official capacities, and seek injunctive relief, compensatory and punitive damages, attorneys' fees and costs, and other relief which the court deems proper. (Doc. 100, ¶ 10, p. 6).

## A.     Mr. Williams' Testimony

Mr. Williams testified in his deposition that he had been incarcerated since at least 1989, and that, most recently, he had been at the PCC since 2000. (Doc. 153-2 at 9). When asked about CO Silvey's allegedly objectionable conduct, Mr. Williams testified that, when in the visiting room at PCC, CO Silvey told his grandchildren that they were not allowed to wear barrettes in their hair, despite the fact that other children were allowed to wear barrettes; CO Silvey would interrupt card games he and Mrs. Williams played in the visiting room, asked them questions about the cards and would have other guards come to their table and interrupt their visits; and Mr. Williams felt the guards were continually watching him and his wife, as a result

of CO Silvey's instructions that they do so. Mr. Williams testified that he first filed a grievance about CO Silvey's conduct in the visiting room concerning events on January 19, 2008, when he received a conduct violation for sharing a cup of coffee with Mrs. Williams; in fact, they shared coffee bags, not a cup of coffee. (Doc. 153-2 at 9-23). It is undisputed that Mr. Williams appealed the conduct violation he received for sharing coffee, and it was ordered that the violation be dismissed and expunged. (Doc. 153-10).

Mr. Williams further testified that CO Silvey picked on black people in the visiting room; he never heard CO Silvey make a racial comment; CO Silvey "grouped together" all prisoners and "talked down to all of the prisoners"; while Mr. Williams had visitors, "most of the time" he was put in the front of the room; and CO Silvey would "sit there and stare at" him and his visitors. Mr. Williams felt this staring was harassment. He did not know if CO Silvey tried to irritate anyone else. (Doc. 153-2 at 24-27).

Mr. Williams additionally testified that CO Silvey threatened to terminate his visiting privileges with Mrs. Williams; CO Silvey never actually did so, although she interrupted their visit once when she called Mrs. Williams into the hall about her wearing a wig; and, once, CO Silvey told Mr. Williams that she was tired of his complaining, and stated, "one more time, you are done." (Doc. 153-2 at 29-30).

When asked about being put in the hole specifically linked to CO Silvey, Plaintiff said he was put there once, in June 2009, for passing canteen items in the general population; he admitted that he "passed canteen," which means that he passed food to another inmate. Mr. Williams testified that he did not think that CO Silvey had anything to do with his being put in the hole, but that "once [he] got to the hole, [] she had something to do with what was going on over there," which was that he was "tortured," and denied food, showers, recreation, proper

clothing, and a mattress.  The basis of this allegation was that CO Silvey's fiancé, Charles Conrad, was working in the hole.  Mr. Williams was in the hole from June 2009 until February 2010.  While in the hole, Mr. Williams said he received conduct violations about every other day, which resulted in his long stay there.  (Doc. 153-2 at 33-36).  Mr. Williams also testified that he believed he was *kept* in the hole for the period from June 2009 to February 2010 because he filed grievances against CO Silvey and because he filed the instant lawsuit; the lawsuit was filed just a few months before he went into the hole.[2]  (Doc. 153-2 at 37-43).

Mr. Williams testified that CO Silvey kept him from using the vending machines and using the microwave in the visiting room despite a rule, then in effect, that permitted an inmate to go to the vending machine or use the microwave when his visitor had a disability.  Mr. Williams testified that a disabled visitor had to provide documentation of her disability; and that Mrs. Williams provided such documentation.  (Doc. 153-2 at 44-45).

Mr. Williams said that, on May 18, 2008, CO Silvey made him sign a warning log after a situation occurred while he and his wife were playing a card game; CO Silvey asked what kind of card game they were playing; Mr. Williams did not think CO Silvey was serious, so she asked him again; Mr. Williams said, "My deuce"; and CO Silvey said, "Like you mean I should mind my own business."  When the visit was over, Williams said that CO Silvey threatened to write him up if he did not sign the warning log.  (Doc. 153-2 at 48-49).  It is undisputed that Mr. Williams did not get a conduct violation as a result of the incident and of his signing the warning log.

On May 26, 2008, Mr. Williams filed a grievance alleging that PCC staff was harassing him and his wife in the visiting room by not letting him go to the vending machines, by asking him what card game he and his wife were playing, and by making him sign a warning about

---

[2] The original Complaint in this matter was filed on February 5, 2009.  (Doc. 1).

visiting room rules. Mr. Williams alleged that he felt that staff treated him differently than others in the visiting room. (Doc. 153-16).

When asked if there was any other behavior against him by CO Silvey which he considered harassment or retaliation, other than that described above, Mr. Williams responded that she was "rude." (Doc. 153-2 at 49).

As for Sergeant Whitener, Mr. Williams testified that he did not see her as often as he did CO Silvey, and that the only contact he had with Sergeant Whitener was when she issued him a conduct violation along with CO Silvey (for sharing the coffee); Sergeant Whitener conducted the interview with CO Silvey for the violation. When asked what his complaint against Sergeant Whitener was, Mr. Williams responded that she should have corrected the conduct violation "on the spot"; Sergeant Whitener processed the violation to support CO Silvey. Mr. Williams never filed a grievance about the visiting room that had anything to do with Sergeant Whitener, although he thought the grievance he filed about the January 19, 2008 coffee incident was against both CO Silvey and Sergeant Whitener. Mr. Williams testified that he felt all the prison officers were related; they were "kinfolk and if you step on one of them's shoes, you stepped on all of them shoe." He did not know if CO Silvey and Sergeant Whitener were related, but he felt Sergeant Whitener picked on him when she processed "that write up." (Doc. 153-2 at 53-57).

When asked about his complaints about Deputy Warden Griffith, Mr. Williams testified that she was "pretty much [] CO Silvey's boss," and he thought "she allowed whatever CO Silvey was doing to" him and his wife. Mr. Williams said that Deputy Warden Griffith knew about his problems with CO Silvey, particularly the card game incident, because when he wrote to Warden Roper about it, Roper referred the complaint to Deputy Warden Griffith. Mr. Williams testified that Deputy Warden Griffith said she was not going to do anything about his

complaint because he had filed a grievance on the matter. Mr. Williams further testified that Deputy Warden Griffith could have corrected the problem but that she did not. Mr. Williams also testified that he thought Deputy Warden Griffith's normal way of doing things was to postpone doing something or doing nothing at all; he did not know if she treated other inmates any differently than she treated him; Mr. Williams did not remember if he ever filed a grievance against Deputy Warden Griffith; and he could not recall if he ever filed a grievance that affected Deputy Warden Griffith in any way. (Doc. 153-2 at 58-63; Doc. 153-15 (05/28/2008 memo from Griffith to Williams suggesting he await the outcome of his grievance)).

When asked what his complaints against Warden Roper were, Mr. Williams testified: "I think he let me down, as far as his legal duty toward maintaining my safety and well being and I've got injuries now that I can't get treated for, just from being in the hole, under those conditions, for that period of time. My body got all these spots on it and they won't treat it. It causes me a lot of discomfort and itching." He said he had a rash because of being in the hole. Mr. Williams thought Warden Roper treated him differently than other inmates because other inmates were not put in the hole for minor or manufactured violations. (Doc. 153-2 at 65-66).

Mr. Williams testified that he told Warden Roper, in a letter, that he felt like the Correctional Officers in the visiting room, including CO Silvey, were "trying to concoct some type of situation for [him] to be put in the hole," but that he was not put in the hole after he wrote the letter. (Doc. 153-2 at 60). He felt that, when he was in the hole in 2009, he made Deputy Warden Griffith, Warden Roper, and others aware of what he was going through and "nobody done anything"; he felt that they would not do anything because he filed grievances "against the prison"; and he based this belief "on the way they get back at prisoners for filing grievances or a lawsuit around [the prison]." (Doc. 153-2 at 60-63; Doc. 153-14 (05/22/2008 letter)). Mr.

Williams testified that he did not know any other prisoners who never filed a grievance; he did not feel like he was being treated differently; he felt like he was being "targeted"; he "really [had] no idea" why he was being targeted; and CO Silvey, Griffith, and Roper targeted him. (Doc. 153-2 at 63-64). Specifically, Mr. Williams testified: "I think I was a target and I don't know, I don't know. I don't know what the reasons behind this was or what was on their mind when they was doing it. I just know how I was feeling when it was happening to me." (Doc. 153-2 at 65). Mr. Williams testified that he was aware of "repercussions or possible repercussions" from his filing grievances, including grievances about the visiting room, but that he did not have a choice and continued to file grievances. (Doc. 153-2 at 70).

**B.      Mrs. Williams' Testimony**

In regard to the earrings incident, Mrs. Williams testified that CO Silvey made a rule, around 2007 or 2008, that visitors had to wear post-style earrings; prior to that time she could wear other types of earrings. She reiterated what Mr. Williams said about the card game. In regard to the wig incident described by Mr. Williams, Mrs. Williams said she had been wearing a "ponytail wig" since 1997 at every prison in which Mr. Williams had been; then one day she put on her other wig. She acknowledged that nobody could wear a wig or hairpiece without a doctor's statement, but she also testified that "other people wore wigs" and that she was singled out. She further said that she felt CO Silvey "told them to change" the rules and that she actually "changed the rules down in the vising room, that [visitors] couldn't wear a wig or hairpiece." Mrs. Williams also testified that CO Silvey made her granddaughter take her barrettes out. (Doc. 153-3 at 21-28).

Mrs. Williams testified that one time CO Silvey came to the table where she and Mr. Williams were in the visiting room and told Mr. Williams that "if he continued to file grievances

and writ[e] the warden, then she was going to take [their] privileges from [them]," but that their privileges were never taken from them. Mrs. Williams said that she had written the warden, the President, and Senator Claire McCaskill about the situation. (Doc. 153-3 at 28-29).

Mrs. Williams testified that she felt like prison staff picked on her and Mr. Williams because of CO Silvey; CO Silvey went around to different tables in the visiting room and talked against Mr. Williams and herself; she "did not have a clue why [CO Silvey] started picking on [her]"; she felt CO Silvey picked on "most of the black people"; and CO Silvey told the black people where to sit but she would ask the white inmates where they wanted to sit. Mrs. Williams testified both that CO Silvey started picking on Mr. and Mrs. Williams before Mr. Williams filed any grievances, and that she did not remember if they had filed grievances when CO Silvey started picking on them. (Doc. 153-3 at 33-36).

Mrs. Williams also testified that when she wrote and called Warden Roper, he never contacted her; she thought that complaining and filing grievances helped the situation; and prison personnel had no longer been picking on Mr. Williams and herself like they had been. (Doc. 153-3 at 42-44).

Plaintiffs acknowledged in their depositions that there were rules against sharing beverages, wearing wigs, and inmates using the visiting room vending machines and microwaves, although Mrs. Williams testified that other people "didn't have to obey that rule." (Doc. 153-3 at 37).

C.     **Attestations by Defendants**

CO Silvey attested that she does not have the authority to make visiting room rules, as those rules are made by the DOC and PCC; each institution has authority to make stricter rules, but does not have authority to make more lenient rules; CO Silvey does not have the authority to

interpret rules; and visiting room rules are subject to change.  CO Silvey also attested that it was her understanding that sharing a coffee bag was tantamount to sharing a beverage.  She further attested that visiting room rules, in 2008, included no sharing of food and beverages; only visitors were allowed to use vending machines and microwaves; exceptions to the vending machine/microwave rule could be made with proper documentation of a visitor's medical condition; inmates were to be seated by staff; only post-type earrings were allowed; hard plastic or metal barrettes were not allowed to be worn by visitors; and wigs were allowed to be worn by visitors only if the visitor had a doctor's note.  (Doc. 153-4 (Silvey Aff.)).

As for the incident involving Plaintiffs' playing cards, CO Silvey attested that she believed Plaintiffs were sharing prohibited information and using the card game as a code to pass prohibited information because she heard Mr. Williams identify specific areas of the institution as he was laying out cards, which included the tower, an armed post.  She disagreed with Mr. Williams' testimony that Mr. Williams responded "My Deuce"; rather, CO Silvey attested that she heard Plaintiff respond "nunya," meaning none of your business.  (Silvey Aff. ¶¶ 13-14).

As for the incident involving the vending machine, CO Silvey attested that neither Mr. nor Mrs. Williams gave her documentation regarding Mrs. Williams' disability, although Mrs. Williams testified that she had a note regarding her disability on file at the time of the incident.  As for CO Silvey's not permitting Plaintiffs to choose their seats in the visiting room, CO Silvey attested, and written policy establishes, that inmates and visitors are not allowed to choose their seats.  (Silvey Aff. ¶ 8; Doc. 153-13, Visiting Room Rules, Rule 6).  As for Mr. Williams' treatment while he was in the hole, CO Silvey attested that, as a correctional officer assigned to the visiting room, she has no authority to dictate or command any other correctional officers,

including those assigned to administrative segregation, and that she did not direct or instruct any other correctional officer to discipline or punish Mr. Williams. (Silvey Aff. ¶ 9).

Sergeant Whitener was never assigned to the visiting room at PCC on a permanent basis. On January 19, 2008, she was temporarily assigned there, for less than one hour, for the sole purpose of reading a conduct violation to Mr. Williams. Correctional officers' duties include issuing conduct violations against inmates when warranted. If a correctional officer issues a conduct violation, neither the warden nor other staff members can remove it unilaterally. There is a due process procedure in place at the PCC which an inmate may pursue if he feels a conduct violation is unwarranted.[3]

Warden Roper attested that, when he received a complaint letter regarding a constitutional violation, he either investigated the matter or sent it to an assistant warden for purposes of investigation. (Doc. 153-6 (Roper Aff.) ¶ 3). In regard to a letter written by Mrs. Williams, dated September 4, 2008, concerning the vending machines, Warden Roper referred the matter to Assistant Warden Michael Lundy. Lundy concluded, in a letter written to Mrs. Williams, CO Silvey was not harassing Mrs. Williams, but was following rules with the information she had; and he concluded that Mrs. Williams could use the vending machines and microwave if she provided a doctor's note, but that Plaintiffs could not alternate use. (Doc. 153-12). As for a May 22, 2008 letter Mr. Williams sent to Warden Roper, complaining of CO Silvey's treatment of him in the visiting room (Doc. 153-14), Warden Roper forwarded the letter to Deputy Warden Griffith (Doc. 153-15). Deputy Warden Griffith sent a memo to Mr.

---

[3] Plaintiffs do not provide documentation to refute the attestations of Sergeant Whitener, Warden Roper, or CO Silvey concerning the above mentioned facts, and thus, their factual attestations are undisputed. See Anderson, 477 U.S. at 247.

Williams, on May 28, 2008, indicating that, since a grievance had been filed on the matter, he should await the outcome of the grievance. (Doc. 153-15).

## LEGAL FRAMEWORK and DISCUSSION

### A.    Plaintiffs' Official Capacity Claims

Plaintiffs have made claims for damages and injunctive relief. With regard to the damages claim, a state official acting in his or her official capacity is not a person within the meaning of § 1983. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989). Consequently, state officials cannot be sued for damages in their official capacity under § 1983. Id. In the instant case, Plaintiffs have sued all Defendants in their individual and official capacities. (Doc. 100).

Although federal courts may entertain suits seeking only prospective injunctive relief against state officials only under some circumstances, see Ex parte Young, 209 U.S. 123, 159-160 (1908); Will, 491 U.S. at 71, an exception applies against officials "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected by an unconstitutional act, violating the Federal Constitution." Young, 209 U.S. at 156. See also Reprod. Health Servs. Of Planned Parenthood of St. Louis Region, Inc., 428 F.3d 1139, 1145 (8th Cir. 2005) (Young's exception to Eleventh Amendment immunity applies only to action seeking prospective injunctive relief against an official with some connection to the enforcement of an allegedly unconstitutional statute).

Mrs. Williams testified that the alleged retaliation has subsided; things have gotten better; and she believed her and her husband's grievances and complaints helped resolve the alleged negative treatment they experienced. Moreover, Mrs. Williams testified that CO Silvey picked on Plaintiffs before Mr. Williams filed grievances. Mr. Williams testified that it seemed that

sometimes after he complained, things might improve or cease for a while; possible repercussions did not stop him from filing grievances; and his visiting privileges were never taken away; and he had no idea why he was "targeted."

To the extent Plaintiffs cite Randolph v. Rogers, 170 F.3d 850 (8th Cir. 1999), to support their argument that they face future retaliation and that, therefore, prospective injunctive relief is warranted, the court finds that Randolph does not support granting such relief in the matter under consideration. Specifically, the Eighth Circuit held, in Randolph, 170 F.3d at 856, that "[a] claim for equitable relief is moot 'absent a showing of irreparable injury.'" The irreparable injury requirement cannot be met "where there is no showing of any real or immediate threat that the plaintiff will be wronged again.'" (internal citation omitted). Notably, as discussed above, Mrs. Williams testified that the situations of which Plaintiffs complain had improved. Further, in Randolph, the DOC did not provide a sign language interpreter for a deaf inmate during grievance proceedings, and *indicated that it would not do so in the future*; in the instant matter, Plaintiffs' assertion of a future threat of retaliation is speculative. In any case, as set forth above, Defendants' conduct regarding Plaintiffs' grandchildren's barrettes, Mrs. Williams' wig, Plaintiffs' sharing a coffee bag, Plaintiffs' being told where to sit in the visiting room, and referring complaints to administrative staff was consistent with their reasonable beliefs about the situations and their enforcement of prison rules and procedures. As such, the court finds that summary judgment should be granted in Defendants' favor in regard to Plaintiffs' official capacity claims.

**B. Legal Standard for Plaintiffs' § 1983 Individual Capacity Claims**

The two essential elements of a cause of action pursuant to § 1983 are: "'(1) whether the conduct of which the plaintiff complains "was committed by a person acting under color of state

law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" DuBose v. Kelly, 187 F.3d 999, 1002 (8th Cir. 1999) (citations omitted).

A claim is not cognizable under § 1983 where a plaintiff fails to allege or prove that defendant was personally involved in or directly responsible for the incidents that injured him or her. Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985); see also Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995) (respondeat superior theory inapplicable in § 1983 suits). Liability under § 1983 requires a causal link and direct responsibility for the alleged deprivation of rights. Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990). Cf. Walton v. Dawson, _ F.3d _, 2014 WL 2053835, at *12 (8th Cir. May 20, 2014) ("The doctrine of qualified immunity requires "an individualized analysis of each officer's alleged conduct."; finding it insufficient that plaintiff's evidence of subjective knowledge rested on knowledge of another officer).

To prevail on a § 1983 First Amendment claim for retaliation, a plaintiff must show: (1) he engaged in a protected activity; (2) the defendant took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated by the exercise of the protected activity. Santiago v. Blair, 707 F.3d 984, 991 (8th Cir. 2013) (citing Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004)). The filing of grievances and lawsuits are protected activity, see Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007), but simply because the alleged adverse action occurred after such filing does not make it retaliatory conduct, see Wise v. Oglesby, 2007 WL 5022104, at *13 (W.D. Ark. Nov. 7, 2007) (unpublished). Likewise, inmates have a constitutional right, under the First Amendment, to access the courts. Cf. Lewis v. Casey, 518 U.S. 343, 351 (1996).

Further, a plaintiff's mere belief that defendants acted with retaliatory motive is simply insufficient to show intent. <u>Wise</u>, 2007 WL 5022104, at *13 (citing <u>Wilson v. Northcutt</u>, 441 F.3d 586, 593 (8th Cir. 2006)). Thus, to avoid summary judgment on a retaliation claim, a plaintiff must submit "affirmative evidence" of a retaliatory motivation for a prison official's objectionable conduct. <u>See</u> <u>Lewis v. Jacks</u>, 486 F.3d 1025, 1029 (8th Cir. 2007). Bare allegations of malice on the part of the defendants are not enough to establish a retaliation claim, <u>see</u> <u>Crawford-El v. Britton</u>, 523 U.S. 574, 558 (1998); to resist summary judgment where an inmate alleges retaliation for filing grievances, the inmate must provide sufficient evidence that the prison official's conduct of which he complains "would chill an inmate of ordinary firmness from filing grievances," <u>see</u> <u>Lewis</u>, 486 F.3d at 1029. <u>See also</u> <u>Walton</u>, 2014 WL 2053853, at *12 (summary judgment is appropriate where non-moving party provides nothing but 'speculation, conjecture, or fantasy" to rebut moving party's factual assertions). The "ordinary firmness requirement "is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." <u>Santiago v. Blair</u>, 707 F.3d 984, 992 (8th Cir. 2013) (quoting <u>Garcia v. City of Trenton</u>, 348 F.3d 726, 728 (7th Cir. 2003)).

Further, an inmate's retaliation claim fails if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule. Thus, a defendant may successfully defend a retaliatory discipline claim by showing "some evidence" the inmate actually committed a rule violation. <u>Bandy-Bey v. Crist</u>, 578 F.3d 763, 766 (8th Cir. 2009). Thus, when a prisoner claims that he was disciplined for exercising his First Amendment rights, he must satisfy the "heavy burden of showing that the prison officials who disciplined him had an impermissible motive for doing so, and that *but for* this impermissible motive, the disciplinary charges would not have been brought." <u>Orebaugh v. Caspari</u>, 910 F.2d 526, 529 (8th Cir. 1990) (emphasis added).

Additionally, a constitutional violation is not established where an inmate suffers no harm as a result of alleged unconstitutional conduct. See id. (access to courts claim failed because inmate did not demonstrate that defendants' failure to grant him the library time he requested "resulted in an actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim") (citation omitted); Hamm v. Moore, 984 F.2d 890, 892 (8th Cir. 1992) (upholding summary judgment in favor of defendant where inmate alleged prison officials harassed him to prevent him from carrying out his duties as prison law clerk; inmate could not "state a claim for relief based on retaliatory conduct in view of his concession that the defendants have not fired him from his job"); see also Lewis, 518 U.S. at 349 (requirement that an inmate show "actual injury" derives from the constitutional principle of standing). Broad and conclusory allegations of retaliation are insufficient to give rise to a constitutional violation. See Flittie v. Solem, 827 F.2d 276, 281 (8th Cir. 1987).

Finally, as previously stated by the Eighth Circuit in this matter, a prison visitor may state a claim of retaliation against prison officials. Williams v. Silvey, 375 Fed. Appx. 648 (8th Cir. 2010) (per curiam) (unpublished). Although the parties do not address law specifically applicable to Mrs. Williams, the court notes that when addressing prison visitors' claims of constitutional intrusions upon summary judgment, courts balance the interest of a prison to maintain institutional security with the intrusion upon the visitor. Cf. Smothers v. Gibson, 778 F.2d 470 (8th Cir. 1985). The Third Circuit has held that "[t]he Due process Clause has not been held to guarantee an interest in prison visitation. Pfender v. Sec'y Pennsylvania Dept. of Corrs., 443 Fed. Appx. 749, 752 (3rd Cir. 2011) (per curiam) (unpublished) (citing Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989) (rejecting notion that "unfettered visitation is guaranteed

directly by the Due Process Clause"); <u>Overton v. Bazzetta</u>, 539 U.S. 126, 131 (2003) (observing that "freedom of association is among the rights least compatible with incarceration").

Once a prison establishes rules permitting visitation, however, a liberty interest in visitation is created for a prisoner. <u>Taylor v. Armontrout</u>, 894 F.2d 961, 963 (8th Cir. 1989). Nonetheless, where a right to visitation exists, there is no constitutional violation when actions of prison officials regarding a visitor are "reasonably related to legitimate penological interests." <u>Pfender</u>, 443 Fed. Appx. at 751 (prison officials have a legitimate penological interest in preventing inmates from possessing items that can be used to escape). <u>See also</u> <u>Bills v. Dahm</u>, 32 F.3d 333, 336 (8th Cir. 1994) (prison officials entitled to qualified immunity on alleged equal protection violation based on overnight visits with children being permitted in women's prison and not in men's prison; prison officials could find the denial of such privileges were "rationally related to a legitimate penological objective"); <u>Bumgarner v. Bloodworth</u>, 768 F.2d 297, 301 (8th Cir. 1985) (per curiam) ("We recognize that visitation rights are "rights" with respect to which the Supreme Court has given broad discretionary authority to administrators in order to manage the prison.") (quoting <u>Hewitt v. Helms</u>, 459 U.S. 460, 467 (1983)). Further, the Eighth Circuit has noted that "attributes of privacy of a jail may hardly be equated with those of a home, an automobile, an office, or a hotel room." <u>Bumgarner</u>, 768 F.2d at 301.

## C.    Allegations Against CO Silvey

First, given that Plaintiffs have not refuted CO Silvey's testimony regarding visiting room rules, the court finds that the existence of these rules is undisputed. <u>See</u> <u>Anderson</u>, 477 U.S. at 247; <u>See also</u> <u>Walton</u>, 2014 WL 2053835, at *12.

As a general matter, as discussed above, Plaintiffs did not testify that CO Silvey's allegedly objectionable conduct was due to retaliatory reasons. Plaintiffs speculated that CO

Silvey had "her picks," she had "mental issues," and that Plaintiffs' race played a factor. Additionally, both Mr. and Mrs. Williams testified that they did not know why CO Silvey allegedly harassed them. On this basis alone, the court finds that summary judgment should be granted in Defendants' favor as to all claims against CO Silvey. See Walton, 2014 WL 2053835, at *12 (reasoning that speculation, conjecture, or fantasy are insufficient to defeat summary judgment); Santiago, 707 F.3d at 991 (requiring retaliatory motive for constitutional violation based on retaliation); Lewis, 486 F.3d at 1029 (requiring affirmative evidence of retaliatory motive for objectionable conduct).

Although Plaintiffs argue in response to the pending Motion that they also have said CO Silvey had retaliatory intent, any change in their deposition testimony is insufficient to create a genuine issue of material fact as to CO Silvey's motivation. See Marathon Ashland Petroleum, LLC, v. Int'l Bhd. of Teamsters, 300 F.3d 945, 951 (8th Cir. 2002) (summary judgment appropriate where party's sudden and unexplained revision of testimony creates an issue of fact where none previously existed). As for Plaintiffs' allegations that CO Silvey generally harassed them and made them feel uncomfortable, these broad and conclusory allegations are insufficient so support a constitutional violation. See Flittie, 827 F.2d at 281.

(1)     Conduct Violation for Sharing Coffee Bag:

It is undisputed that visiting room rules prohibit the sharing of food and beverages; that Plaintiffs shared a coffee bag on January 19, 2008; that, when she issued Mr. Williams a conduct violation for Plaintiffs' sharing a coffee bag, CO Silvey thought that sharing a coffee bag was the same thing as sharing a beverage; and that, after Mr. Williams appealed the conduct violation, the violation was dismissed. The court finds, given CO Silvey's reasonable belief that sharing a coffee bag was a violation of visiting room rules, that the undisputed facts establish that CO

Silvey did not violate Plaintiff's constitutional rights by issuing the conduct violation. In any case, because the violation was rescinded and Plaintiffs suffered no adverse consequence, it cannot be said that CO Silvey's issuance of a conduct violation would have chilled a person of ordinary firmness from filing complaints or grievances; in fact, the contrary can be said, as rescinding the violation would have encouraged a person of ordinary firmness to file complaints or grievances. See Santiago, 707 F.3d at 991; Orebaugh, 910 F.2d at 529.

(2)     Signing the Warning Log:

It is undisputed that CO Silvey was responsible for enforcing rules in the visiting room; that she believed she heard Mr. Williams discussing a map of the prison when Plaintiffs were playing cards in the visiting room; and that she thought Mr. Williams responded that it was none of CO Silvey's business when she questioned Plaintiffs about the card game. Whether Mr. Williams actually responded "my deuce" or "nunya" to CO Silvey's question regarding the card game he and Mrs. Williams were playing is not "material"; what is material is what CO Silvey thought Mr. and Mrs. Williams were discussing. Fed. R. Civ. P. 56(a). In view of the undisputed facts establishing that CO Silvey had reason to believe that Plaintiffs were violating rules, that her job required her to enforce rules in the visiting room, and that Plaintiffs suffered no harm as a result of Mr. Williams' signing the log, and in view of Plaintiffs offering no affirmative evidence of a retaliatory motive on CO Silvey's part, the court finds that the undisputed facts do not establish a constitutional violation as a result of CO Silvey's requiring Mr. Williams to sign the warning log. See Bandy-Bey, 578 F.3d at 766.

3.     Assigned Seating in Visiting Room:

Plaintiffs allege that CO Silvey assigned them seating in the visiting room, but let other inmates and their visitors choose their seats. It is undisputed, however, that prison rules required

CO Silvey to seat inmates and their visitors, and that, by telling Plaintiffs where to sit, CO Silvey was merely performing her job. Further, Plaintiffs assert, without factual support, that CO Silvey did not assign seats to others, see Walton, 2014 WL 2053835, at *12, and Plaintiffs fail to establish that they suffered any harm as a result of their being assigned seating, Orebaugh, 910 F.2d at 529. Assigning seats in the visiting room, moreover, is reasonably related to penological considerations. See Bumgarner, 768 F.2d at 301. As such, the court finds that the undisputed facts fail to establish that CO Silvey violated Plaintiffs' constitutional rights by assigning them seating in the visiting room.

   4.  <u>Punitive Treatment in Administrative Segregation</u>:

  Mr. Williams admits that he passed canteen in violation of prison rules when he was placed in administrative segregation in June 2009 through February 2010. Thus, any claim that he was placed in administrative segregation by CO Silvey out of retaliation fails. See Bandy-Bey, 578 F.3d at 766. To the extent Plaintiffs speculate CO Silvey was responsible for Mr. Williams' objectionable treatment while in administrative segregation simply because she was engaged to a person who worked there or simply because all the prison officials allegedly are related, Plaintiffs present no affirmative evidence to support such arguments. CO Silvey, moreover, attested that she had no involvement in establishing conditions in administrative segregation. As such, the court finds that Plaintiffs have failed to meet their burden on summary judgment to refute CO Silvey's attestations regarding Mr. Williams presence in administrative segregation and failed to show that CO Silvey played any role in the allegedly objectionable conditions of Mr. Williams' confinement while he was in administrative segregation. See Anderson, 477 U.S. at 247; Walton, 2014 WL 2053835, at *12.

5.     <u>Wearing of Earrings, Barrettes, and Wigs</u>:

Plaintiffs do not sufficiently refute CO Silvey's attestation that, at the least, she did not have a note verifying Mrs. Williams' disability at the time of the vending machine incident. <u>See</u> <u>Anderson</u>, 477 U.S. at 247; <u>Walton</u>, 2014 WL 2053835, at *12 ("speculation, conjecture, or fantasy" are insufficient to rebut sworn testimony). As for Plaintiffs' claims that CO Silvey told Mrs. Williams she could only wear post-earrings and that she could not wear a wig, and as for CO Silvey's telling Plaintiffs' grandchildren that they could not wear certain barrettes, CO Silvey was performing her duty to enforce visiting room rules when she did so. <u>See</u> <u>Bandy-Bey</u>, 578 F.3d at 766. Further, the prohibition against wearing wigs and certain earrings and barrettes would not chill a person of ordinary firmness from filing complaints or grievances. <u>See</u> <u>Santiago</u>, 707 F.3d at 991.

6.     <u>Threatening Visiting Privileges</u>:

Although Plaintiffs contend that CO Silvey threatened to take away their visiting privileges, it is undisputed that she never did so. As such, the court finds that the undisputed facts establish that Plaintiffs' constitutional rights were not violated. <u>See</u> <u>Bandy-Bey</u>, 578 F.3d at 766.

**D.     Allegations Against Sergeant Whitener**

Plaintiffs claim Sergeant Whitener violated their constitutional rights because she did not correct CO Silvey's conduct when CO Silvey issued a conduct violation for the incident involving Plaintiffs' sharing a coffee bag. First, Mr. Williams filed a grievance which resolved the matter, and, as the conduct violation was rescinded, Mr. Williams suffered no adverse consequence as a result of the conduct violation. <u>See</u> <u>Bandy-Bey</u>, 578 F.3d at 766. Second, Plaintiffs' simply speculating that Sergeant Whitener supported CO Silvey is insufficient to

establish their claim of a constitutional violation.  See Wise, 2007 WL 5022104, at *13.  Finally, the undisputed facts establish that the decision to issue the conduct violation was CO Silvey's, see Madewell, 909 F.2d at 1208, and that Sergeant Whitener had no authority to rescind the violation, see Martin, 780 F.2d at 1338.  As such, the court finds that the undisputed facts establish that Sergeant Whitener did not violate Plaintiffs' constitutional rights, and that summary judgment should be granted in Defendants' favor in regard to Plaintiffs' claims against Sergeant Whitener.

**E.    Allegations Against Warden Roper**

Mr. Williams claims Warden Roper treated him differently from other prisoners when Mr. Williams was in the hole; Mr. Williams holds Warden Roper responsible for the conditions he suffered while in the hole and for his being placed and kept in the hole for minor infractions. Mr. Williams also complains that Warden Roper never contacted him in response to his May 22, 2008 letter complaining of CO Silvey's alleged harassment of Plaintiffs in the visiting room.

First, the undisputed facts do not establish that Warden Roper had any direct involvement with Mr. Williams' being placed in administrative segregation.  See Walton, 2014 WL 2053835, at *12 (individualized analysis of each officer's conduct required); King, 702 F. Supp. 2d at 1081-82).  Second, Mr. Williams admits that he committed the infraction pursuant to which he was placed in administrative segregation, and he does not deny that he committed the infractions which caused his continued placement in administrative segregation.  Third, Warden Roper did take action in response to Mr. Williams' letter in which he complained about CO Silvey's alleged harassment of Plaintiffs in the visiting room; Warden Roper followed prison procedure and referred Mr. Williams' letters to an Assistant Warden Griffith, who did respond; Assistant Warden Griffith's response noted that, since a grievance was filed regarding the alleged

harassment, Mr. Williams should await the grievance's outcome. Assistant Warden Griffith's response was in accordance with the prison grievance procedure established by the Missouri Department of Corrections.

Fourth, in response to Mrs. Williams' September 4, 2008 letter indicating she was disabled and complaining that CO Silvey would not let Mr. Williams use the vending machines, Warden Roper took action, and referred the matter to an assistant warden; the assistant warden investigated the matter and concluded that CO Silvey was enforcing the rules based on the information available to her and was not harassing Plaintiffs; he also informed Mrs. Williams that Mr. Williams could use the vending machines if Mrs. Williams provided a doctor's note. Plaintiffs do not assert that after providing a note, Mr. Williams was not permitted to access the microwave or vending machines, although, as discussed above, Mrs. Williams suggests, without verification, that she had submitted a note prior to the vending machine incident.

Fifth, when asked in his deposition why Warden Roper targeted him, Mr. Williams replied that he "really [had] no idea." (Doc. 153-2 at 64). Mrs. Williams testified that she did not know if Warden Roper normally contacts people when they write him letters. When asked if she had reason to believe that Warden Roper did not contact her because of grievances that were filed, Mrs. Williams responded, "I don't have an idea." (Doc. 153-3 at 43). Sixth, as discussed above, Mrs. Williams also testified that she thought her complaining and filing grievances "helped." (Doc. 153-3 at 42-43). The court finds, therefore, that the undisputed facts do not establish that Warden Roper had a retaliatory motive when he failed to contact Mrs. Williams, or that he engaged in any conduct which would chill a person of ordinary firmness from exercising his or her right to engage in protected activity, particularly filing grievances. The court further finds that the undisputed facts establish that Warden Roper did not violate Plaintiffs'

constitutional rights and that summary judgment should be granted in Defendants' favor in regard to Plaintiffs' claims against Warden Roper.

## F.     Allegations Against Deputy Warden Griffith

Plaintiffs claim Deputy Warden Griffith ignored CO Silvey's conduct in the visiting room and that she did not do anything about it.  As discussed above, when Warden Roper forwarded Mr. Williams' letter complaining about CO Silvey to Deputy Warden Griffith, Deputy Warden Griffith took action; she investigated the matter and concluded that the issue should be deferred to Mr. Williams' pending grievance.  Further, Plaintiffs have not suggested any evidence of retaliatory motive on Deputy Warden Griffith's part.  As such, the court finds that the undisputed facts establish that Deputy Warden Griffith's conduct would not have chilled a person of ordinary firmness from exercising his or her right to engage in protected activity, particularly filing grievances or lawsuits; that Deputy Warden Griffith did not violate Plaintiffs' constitutional rights; and that, therefore, summary judgment should be granted in Defendants' favor in regard to Plaintiffs' claims against Deputy Warden Griffith.

## G.     Qualified Immunity

Defendants contend that summary judgment should be granted in their favor because they are entitled to qualified immunity.  "In a § 1983 action, state actors may be entitled to qualified immunity."  McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009) (citation omitted). Qualified immunity may shield a government official from liability when performing discretionary functions where his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Nelson v. Shuffman, 603 F.3d 439, 446 (8th Cir. 2010).  Qualified immunity is a question of law, not a question of fact.  McClendon v. Story Cnty. Sheriff's Office,

403 F.3d 510, 515 (8th Cir. 2005).  Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

In Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court held that a court must determine whether the facts, viewed in the light most favorable to the plaintiff, establish whether a *constitutional right has been violated* and whether that *right had been clearly established* at the time of the alleged violation.  The Court further held in Pearson, that, while often appropriate, it is not mandatory to consider these issues in any particular sequence.  Under Pearson, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson, 555 U.S. at 236.  Qualified immunity should be granted when either of the two prongs has been satisfied.

"The doctrine of qualified immunity requires 'an *individualized* analysis of *each* officer's alleged conduct.'"  Walton, 2014 WL 2053835, at *21 (quoting Roberts v. City of Omaha, 723 F.3d 966, 974 (8th Cir. 2013) (emphasis in original).  To withstand summary judgment based on qualified immunity, "[i]t is not enough to say a factual question exists:  the factual dispute must be both 'genuine' and 'material.'"  Id. (quoting Fed. R. Civ. P. 56(a)).  As discussed above, Plaintiffs have established that they were engaged in constitutionally protected activity.  However, Plaintiffs have failed to establish that Defendants retaliated against them and disciplined or warned Mr. Williams because he was engaging in constitutionally protected activity.  Given that Plaintiffs have failed to establish that any of Defendants violated their constitutional rights, the court further finds that Defendants are entitled to qualified immunity.  See Pearson, 555 U.S. at 236; Bills v. Dahm, 32 F.3d 333, 336 (8th Cir. 1994).

Accordingly,

**IT IS HEREBY ORDERD** that the Motion for Summary Judgment (Doc. 152) filed by Defendants is **GRANTED** in its entirety;

**IT IS ORDERED** that a separate judgment in Defendants' favor will be entered incorporating this Memorandum and Order.

Dated this 30th day of June 2014.

     /s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE